UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| KENNETH BAKER AND JENNIFER BAKER | 3:16-cv-038 JWS |
|---|---|
| Plaintiffs, | ORDER AND OPINION |
| vs. | [Re: Motion at Docket 71] |
| BAKER HUGES OILFIELD OPERATIONS, INC., | |
| Defendant | |

## I. MOTION PRESENTED

At docket 71, Defendant Baker Hughes Oilfield Operations, Inc. ("Defendant") filed a motion *in limine* to strike the expert testimony of Barbra Belluomini and Dr. R. Lynn Carlson and the expert report of Tauriainen Engineering and SGS Laboratories ("SGS"); Plaintiffs Kenneth Baker and Jennifer Baker ("Plaintiffs") filed a response at docket 79. Defendant filed a reply at docket 83.

## II. BACKGROUND

Defendant owns and operates a cement blending plant in Nikiski and accepted legal responsibility for any discharge of hazardous waste by its predecessor at the site, BJ Services Company U.S.A. LLC.[1] Defendant held a blended dry cement consisting of Portland Cement and other materials in large silos on the cement blending

---

[1] Depo. Jason Goodwin, p. 14, ll. 1-9.

1

plant property.[2]  Defendant required additional space to accommodate a new customer's order, so Defendant's personnel decided to empty one or more of its storage silos by using a pressure operated system to blow the product onto the back of the Defendant's property.[3]

Plaintiffs own a house on the south side of the Defendant's cement blending property.  Plaintiffs seek damages for diminution of the value of their property and the health problems of Jennifer Baker resulting from Trespass, Landowner Liability/Negligence, Strict Liability pursuant to Alaska's pollution statute, AS 46.03.822, .824 (which provides for strict liability for damage to property or person due to pollution, AS 46.03.824) and Nuisance, all stemming from the discharge from the storage silos.  Plaintiffs have also requested an award of punitive damages.

### III.　　DISCUSSION

**A. Barbra Belluomini may testify as an expert on diminution of value based on stigma associated with contamination of a property or the perception of contamination.**

The thrust of Defendant's complaint about Barbra Belluomini's testimony is that her expert report is not so well developed as the MacSawin Associates, LLC expert report.[4]  Assessing the significance of a difference between the specificity and depth of the expert reports and the conclusions therein is the responsibility of the jury.  The court is responsible for determining if the evidence is admissible.

---

[2] Depo. Jason Goodwin, p. 19, ll. 2-21; p. 100, l. 20 – p. 101, l. 7.
[3] Depo. Jason Goodwin, p. 32, l. 20 – p. 34 l. 5; p. 35, l. 1 – p. 36, l. 17; p. 51, l.18 – p. 52, l.10; p. 94, ll. 5-24.
[4] *See* Memo. in Support of Motion *in Limine*, pp. 15 – 17.

2

Defendant relies on *United States v. 87.98 Acres of Land More or Less in the Cty. of Merced*,[5] for the proposition that the impact of certain activities on the market value of real estate must be specific to the area analyzed. But, this was not the basis for rejection of expert testimony in *87.98 Acres*. The case dealt with the construction of a powerline across then agricultural property that was evaluated for residential development. In particular, the case concerned electromagnetic fields ("EMFs") associated with power lines. The property owner hired "an environmental planner with extensive experience advising developers regarding the impact of EMFs from power transmission lines on the use and development of property."[6] The environmental planner "proposed to testify to the following: (1) public perceptions of the effects of EMFs among residential homeowners and home buyers, (2) the extent and level of EMFs from the Path 15 line that reach beyond the easement into the rest of Campion's property, and (3) the types of studies concerning EMFs for which developers routinely engage her." The court only permitted testimony on public perceptions. Importantly, the environmental planner "was not an expert appraiser."[7] In fact, the court noted, "Wholly apart from evidence of actual health risks, evidence of public perceptions of health risks—even irrational public perceptions—may properly establish an impact on market value. '[I]f fear of a hazard would affect the price a knowledgeable and prudent buyer would pay to a similarly well-

---

[5] 530 F.3d 899 (9th Cir. 2008).
[6] *Id.* at 903.
[7] *Id.*

3

informed seller, diminution in value caused by the fear may be recoverable as part of just compensation.'"[8]

Ms. Belluomini is a resident of Soldotna.[9] She worked at Derry & Associates in Kenai from 2005 to 2016 where she was trained and worked as a real estate appraiser.[10] She has been a member of the Appraisal Institute since 2005[11] and became a certified real estate appraiser in 2008.[12] She has worked at Reliant, LLC since February 2017.[13] Unlike the environmental planner in *87.98 Acres*, Ms. Belluomini is an expert appraiser.

Ms. Belluomini did some research on stigma in the Kenai Peninsula,[14] reviewed research by three associates based on contaminated properties in the Seattle area,[15] reviewed an analysis of a contaminated property in Anchorage,[16] reviewed the Appraisal of Real Estate 14th Edition,[17] and researched deed restrictions.[18] The scope of the expert report she helped produce was limited to "any property that has past

---

[8] Id. at 904 (quoting *United States v. 760.807 Acres of Land*, 731 F.2d 1443, 1447 (9th Cir.1984)). The same conclusion was drawn by another case cited by Defendant *United States v. 760.807 Acres of Land, More or Less, Situated in City & Cty. of Honolulu, State of Hawaii*, 731 F.2d 1443 (9th Cir. 1984). There, the Ninth Circuit held, "in accord with the law of most states, that if fear of a hazard would affect the price a knowledgeable and prudent buyer would pay to a similarly well-informed seller, diminution in value caused by that fear may be recoverable as part of just compensation." *Id.* at 1447.
[9] Depo. Ms. Belluomini, p. 4, l. 22.
[10] Depo. Ms. Belluomini, p. 7, l. 11 – p. 8, line 24.
[11] Depo. Ms. Belluomini, p. 9, ll. 14-19.
[12] Depo. Ms. Belluomini, p. 7, ll. 11-13.
[13] Depo. Ms. Belluomini, p. 7, l. 2 – p. 8, l. 24.
[14] Depo. Ms. Belluomini, p. 21, l. 23 – p. 22, l. 6.
[15] Depo. Ms. Belluomini, p. 18, ll. 7-17.
[16] Depo. Ms. Belluomini, p. 36, ll. 3-22.
[17] Depo. Ms. Belluomini, p. 22, l. 3.
[18] Depo. Ms. Belluomini, p. 22, ll. 5-9.

contamination or [ ] remediat[ion] may have a diminution in value associated with it regardless of location."[19] Ms. Belluomini then conducted additional research specific to Alaska, determining that contaminated and remediated properties have a wide range of diminution of value.[20] Her testimony speaks specifically to the diminution of value from public perceptions of health risks and stigma associated with potentially contaminated land and thus is admissible. Whether the evidence is sufficient to demonstrate the market value of the Plaintiffs' home is a different question entirely.[21]

**B. Dr. Carlson may testify as a hybrid fact and expert witness and specifically as to differential diagnosis and contact toxicity**

Dr. Carlson is a hybrid fact and expert witness. As a preliminary matter, it is important to categorize Dr. Carlson's testimony. Traditionally, treating physicians have been treated as fact witnesses. "They are a species of percipient witness * * * not specially hired to provide expert testimony; rather, they are hired to treat the patient and may testify to and opine on what they saw and did . . . ."[22] But, when a "treating physicians [is hired] to render expert testimony beyond the scope of the treatment rendered," the witness is a hybrid fact and expert witness. [23]

---

[19] Depo. Ms. Belluomini, p. 40, ll. 10-14.
[20] Depo. Ms. Belluomini, p. 41, l. 23 – p. 42, l. 5.
[21] *See, e.g., United States v. 33.5 Acres of Land, More or Less, Okanogan Cty., State of Wash.*, 789 F.2d 1396, 1400 (9th Cir. 1986) ("The preferred means of determining that value is by referring to sales of comparable property. But, if there are no comparable sales or too few to provide a reliable basis for comparison, then other methods may be used to measure just compensation.") (internal citations omitted).
[22] *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 819 (9th Cir. 2011).
[23] *Id.* at 819-20.

The distinction between which portion of hybrid testimony is fact and which is expert is not clearly delineated by the Ninth Circuit, but District Courts within the Circuit have opined on the distinction. These courts have found that treating physicians "testify as percipient witnesses regarding the treatment they rendered to plaintiff, including the plaintiff's presentment of symptoms, their diagnoses, the treatment they provided to plaintiff, and the medical bills incurred for their treatment."[24] The treating physicians testify as experts regarding "causation, and the plaintiff's future medical condition, the reasonableness of the medical expenses incurred, the expenses for future medical treatment, and any other opinions beyond the treatment they rendered to plaintiff."[25] Dr. Carlson was Mrs. Baker's treating physician, but he is also providing testimony regarding causation and medical expenses, thus, he is a hybrid witness.

Dr. Carlson is qualified to testify regarding the treatment rendered, including Mrs. Baker's presentment of symptoms, diagnoses, treatment provided, and the medical bills incurred for the treatment. Defendant challenges Dr. Carlson's ability to testify as to causation. In large part, the challenge is based on Defendant's assessment that its own expert, Dr. Roberts, is better equipped than Dr. Carlson to provide expert testimony on toxicology. But, this comparative analysis is the job of the jury.

---

[24] *Hickman v. State Farm Mut. Auto. Ins. Co.*, No. 3:10-CV-00121-TMB, 2011 WL 13234965, at *5 (D. Alaska Oct. 24, 2011) (citing *Carrillo v. Lowe's HIW, Inc.*, No. 10cv1603–MMA (CAB), 2011 WL 2580666, at *3 (S.D. Cal. June 29, 2011)).

[25] *Id.*

The admissibility of expert witness testimony is left to the district court's discretion.[26] Federal Rule of Evidence 702 governs the admissibility of scientific evidence. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[27] the "Supreme Court charged district courts with the responsibility of ensuring that proffered scientific evidence is both relevant and reliable."[28] "Scientific evidence is deemed reliable if the principles and methodology used by an expert are grounded in the methods of science."[29] A non-exhaustive list of *Daubert* factors includes: "(1) whether the scientific theory or technique can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory or technique is generally accepted in the scientific community."[30]

Reliability and admissibility of differential diagnosis is a "whole sub-body of *Daubert* law."[31] "Differential diagnosis is 'the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings.'"[32] Differential diagnosis generally involves a comprehensive list of "competing causes [that] are *generally* capable

---

[26] *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1055 (9th Cir. 2003), *as amended on denial of reh'g* (Sept. 25, 2003) (citing *Metabolife Int'l., Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001)).
[27] 509 U.S. 579 (1993).
[28] *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1055 (9th Cir. 2003), *as amended on denial of reh'g* (Sept. 25, 2003)
[29] *Id.*
[30] *Id.*
[31] *Id.* at 1057.
[32] *Id.* at 1057-58 (quoting Stedman's Medical Dictionary 474 (26th ed.1995)).

7

of causing the patient's symptoms or mortality."[33]   Including a potential cause that is "*not* so capable" or "neglect[ing] to consider a hypothesis that might explain the clinical findings under consideration" is unreliable.[34]  "A district court is justified in excluding evidence if an expert 'utterly fails ... to offer an explanation for why the proffered alternative cause' was ruled out."[35]

A hypothesis involving "contact toxicity" may be included as part of a differential diagnosis.[36] The proximity of contact between an individual and a potentially toxic substance is a relevant factor in assessing contact toxicity.  "While the mere fact that two events correspond in time and space does not *necessarily* mean they are causally related, 'a temporal relationship between exposure to a substance and the onset of a disease ... can provide compelling evidence of causation.'"[37]

Assessing toxicity does not necessarily require precision.  "While 'precise information concerning the exposure necessary to cause specific harm [is] beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic ... and need not invariably provide the basis for an expert's opinion on causation.'"[38]

---

[33] *Id.* (emphasis in original).
[34] *Id.* at 1058 (emphasis in original).
[35] *Id.* (quoting *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001)).
[36] *Id.* at 1059.
[37] *Id.* (quoting *Westberry v. Gislaved Gummi AB*, 178 F. 3d 257, 265 (4th Cir. 1999)) (emphasis in original).
[38] *Id.* at 1059–60 (quoting *Westberry*, 178 F.3d at 264); *see also Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 157 (3d Cir.1999) ("even absent hard evidence of the level of exposure to the chemical in question, a medical expert could offer an opinion that the chemical caused plaintiff's illness").

Even the "lack of specific scholarly support does not prevent the admission of differential diagnosis testimony: 'The fact that a cause-effect relationship ... has not been conclusively established does not render [the expert's] testimony inadmissible.'"[39]

Dr. Carlson is certified in "functional medicine," which includes training in toxicology.[40] Dr. Carlson started seeing Jennifer Baker on May 17, 2016.[41] He took a history and did an examination.[42] He examined a chemical analysis performed by SGS for Tauriainen Engineering of the contaminated discharge located behind Defendant's plant and spoke with an SGS engineer about soil and water testing.[43] He also examined the MSDS sheets for Portland Cement.[44] Dr. Carlson reviewed a National Institute for Occupational Safety and Health paper on identifying health effects of exposure to crystalline silica, an ingredient of Class G cement.[45] Dr. Carlson indicated that Class G cement contains "five different substances that can cause harm" and Mrs. Baker "was setup to react to substances in the environment."[46] Dr. Carlson has identified a number of Mrs. Baker's medical problems and offers to "explain the pathology of any or all of these problems, and how they were caused or exasperated by her toxicant exposure."[47]

---

[39] *Id.* at 1060 (quoting *Kennedy v. Collagen Corp.*, 161 F.3d 1226 (9th Cir.1998)).
[40] Depo Dr. Carlson, p. 27, ll. 2-20.
[41] Depo Dr. Carlson, p. 62, ll. 4-17.
[42] Depo Dr. Carlson, p. 62, l. 4 – p. 78, l. 6.
[43] Depo Dr. Carlson, p. 10, ll.16-23.
[44] *Id.*
[45] Depo Dr. Carlson, p. 128, l. 6 – p.130, l. 2.
[46] Depo Dr. Carlson, p. 86, ll. 5-25.
[47] Defendant's Ex. 1, Dr. Carlson's letter dated October 11, 2017.

Dr. Carlson explained that some of the symptoms Mrs. Baker experiences were related to the hazardous nature of the cement product.[48]

Dr. Carlson's testimony as a treating physician and hybrid fact and expert witness based on differential diagnosis of contact toxicity is sufficiently relevant and reliable. The strength of Dr. Carlson's testimony, both in fact and relative to Dr. Robert's testimony, is a question for the jury.

**C. Tauriainen Engineering and SGS testing is admissible evidence if presented by trial testimony**

Defendant raises two objections to the Tauriainen Engineering and SGS testing: (1) the expert testimony provided in the Tauriainen Engineering and SGS testing are hearsay and (2) the testing is unreliable.

First, the evidence in the expert reports, as in all expert reports, is hearsay.[49] But, Plaintiffs' have identified and listed both Tauriainen Engineering and SGS on the Plaintiffs' witness list. Testimony reflecting what is in the reports may be admitted.

Second, Defendant asserts but provides no evidentiary support or case law to conclude that the Tauriainen Engineering and SGS tests are unreliable. The complained of chain-of-custody issues can be raised during cross-examination of Tauriainen Engineering and SGS.

---

[48] Depo Dr. Carlson p. 130, l. 3 – p.131, l. 4.
[49] *McEuin v. Crown Equip. Corp.*, 328 F.3d 1028, 1035 (9th Cir. 2003).

### IV. **CONCLUSION**

Defendant's motion *in limine* at docket 71 is DENIED.

DATED this 16th day of July 2018.


/s/ JOHN W. SEDWICK
SENIOR JUDGE, UNITED STATES DISTRICT COURT